Walker, J., delivered the opinion of the Court in which Keasler, Hervey, Richardson, Yeary, and Newell, JJ., joined.
Applicant was convicted of possession of methamphetamine and sentenced to seven years' imprisonment and a $ 10,000 fine. On direct appeal, the court of appeals overruled his claims and affirmed the trial court's judgment. Lalonde v. State , No. 12-16-00070-CR, 2016 WL 6426811, 2016 Tex. App. LEXIS 11763 (Tex. App.-Tyler, Oct. 31, 2016) (mem. op., not designated for publication). Applicant now seeks habeas corpus relief. We deny relief.
I - BACKGROUND
We agree with the court of appeals's recitation of background facts in its opinion on direct appeal and quote from the recitation.
On May 2, 2014, Chief Deputy Stephen Godfrey and Deputies Salomon Landeros and Mario Reyna, all with the Nacogdoches County Sheriff's Department, conducted a "knock and talk" at Appellant's garage apartment to investigate possible narcotics activity. Landeros explained that a "knock and talk" involves talking with people at the residence, revealing that the officers have information that something illegal is occurring inside the residence, and attempting to obtain consent to search. The officers testified that Appellant consented to a search of the apartment.
During the search, the officers found methamphetamine. The State charged Appellant with possession of a controlled substance in an amount less than one gram, to which Appellant pleaded "not guilty." At the conclusion of trial, the jury found Appellant guilty of possession of a controlled substance, and assessed a sentence of imprisonment for seven years, along with a $ 10,000 fine.
Id. at *1, 2016 Tex. App. LEXIS 11763 at *1-2.
At the suppression hearing, Captain Michael Davidson of the Nacogdoches County Sheriff's Department testified that he received information that Appellant had a party the night before the search, at which multiple individuals were using methamphetamine. The next day, the officers went to the house to investigate. When Davidson asked Appellant for permission to search the residence, Appellant stated that it belonged to his mother and the officers needed to ask her for consent. Chief Deputy Godfrey and Deputy Reyna testified similarly. Godfrey told Appellant that, as an occupant, he could consent to search an area that was in his care, custody, and control. Although Davidson testified that Godfrey had the most contact with Appellant once they entered the residence, he and Reyna both testified to hearing Godfrey's conversation with Appellant.
Godfrey, Davidson, and Reyna all testified that, after this conversation, Appellant consented to a search of the residence and his person. Reyna and Davidson testified that Appellant never refused consent. Reyna explained that Appellant merely stated he needed to contact his mother. When asked if Appellant gave consent to secure the other occupant, Reyna testified that Appellant consented to a search of the house, and that it was clear he was giving consent to search the residence and his person. Davidson testified that he never heard Appellant state that the officers could go upstairs to check on another occupant, but could not search.
*721 Godfrey testified that they spoke with the other occupant inside the house, Michelle Reeves, who had been asleep in bed, and that it was evident Appellant had been in bed with Reeves. Appellant's personal items were inside the apartment. Davidson and Reyna testified that it was apparent that Appellant resided in the apartment. The officers testified that they found methamphetamine in a pair of Appellant's pants and in his wallet.
Appellant testified that he temporarily resided in the apartment. He had a party the night before the search and he met Reeves that night. He admitted that someone, but he did not know who, brought methamphetamine to the party. He and several others used methamphetamine at the party. The next morning, when the officers knocked on his door and informed him about the allegations of narcotics activity, Appellant told them that they were misinformed. He testified that the officers asked for consent to search, but he told them they had to contact his mother and stepfather because they owned the property. He told the officers that if his parents consented, he had no problem with a search.
At some point, the officers asked if anyone else was in the house. When Appellant told them about Reeves, the officers stated that they needed to identify her. Appellant told the officers that they could go upstairs for that purpose. He denied telling officers that they could search the residence, and he testified to making it clear that they needed to contact his parents if they wanted to search. He offered to contact his parents, but claimed that the officers would not entertain that idea. Regarding the methamphetamine found in his pants and wallet, he explained that Reeves was upstairs by herself for approximately twenty minutes while he was downstairs talking to the officers. He stated that other individuals may also have had access to his belongings.
Id. at *1-2, 2016 Tex. App. LEXIS 11763, at *3-5.
After a jury trial resulting in conviction and sentencing for possession of methamphetamine, Applicant appealed the trial court's denial of his motion to suppress. Id. at *1, 2016 Tex. App. LEXIS 11763 at *2. The court of appeals concluded that the trial court did not abuse its discretion by denying the suppression motion and overruled Applicant's claim. Id. at *2-3, 2016 Tex. App. LEXIS 11763 at *7.
In this application for writ of habeas corpus, Applicant now contends that he was denied due process and that the State violated Brady regarding State's witness Chief Deputy Sheriff Stephen Godfrey. Brady v. Maryland , 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) ; Kyles v. Whitley , 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) ; United States v. Bagley , 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Godfrey testified at Applicant's suppression hearing and his trial. Godfrey was subsequently indicted for aggravated perjury due to allegations that he had testified falsely in other criminal cases. Godfrey avoided prosecution through a pretrial diversion, but the State indicated it would no longer rely on him as a prosecution witness due to the allegations of aggravated perjury.
We ordered this application filed and set for submission to determine whether: (1) Applicant's conviction should be set aside, and he should be ordered to answer the indictment, in light of the aggravated perjury allegations in the other cases and the alleged aggravated perjury in Applicant's own case; and (2) the State violated Brady *722 regarding Godfrey's aggravated perjury. The parties have briefed these issues.
After Chief Deputy Sheriff Godfrey was indicted for several counts of aggravated perjury, the District Attorney for Nacogdoches County filed a "Brady Notice" reciting the details of Godfrey's perjured testimony and false statements contained in his application for police employment. The Brady Notice stated that Godfrey would not be called to testify on behalf of the State in any matter in Nacogdoches County and that, based upon the facts described in the notice, that office believed it would be a violation of its ethical obligations to sponsor any testimony from Godfrey. The District Attorney also filed a "State's Affidavit in Response to Applicant's Writ of Habeas Corpus" describing the manner of learning of Godfrey's possibly perjured testimony and her investigative efforts that resulted in those allegations being confirmed. In its second motion for extension of time to file a response to the application, the State acknowledged that Godfrey was "one of the main witnesses in this case." Habeas Record 126.
II - PERJURY CLAIM
Applicant claims that his conviction should be set aside in light of Godfrey's aggravated perjury in this and other cases. He asserts that in light of the new evidence impeaching the credibility of State's witness Godfrey, his suppression issue should be sustained. As noted above, we filed and set for submission to determine whether Applicant's conviction should be set aside in light of Godfrey's aggravated perjury.
A. Standard of review
The Due Process Clause of 14th Amendment can be violated when the State uses materially false testimony to obtain a conviction, regardless of whether it does so knowingly. Ex parte Chabot , 300 S.W.3d 768, 770-71 (Tex. Crim. App. 2009). The violation can be caused by false testimony elicited by the State or by the State's failure to correct testimony it knows to be false. Ex parte Ghahremani , 332 S.W.3d 470, 478 (Tex. Crim. App. 2011). Even if no one contends that the prosecutors were aware that they were offering perjured testimony, "we treat perjured testimony as knowingly used if the witness was a member of the 'prosecution team.' " Ex parte Napper , 322 S.W.3d 202, 243 (Tex. Crim. App. 2010).
Not only must the testimony be false, it must also be material. Ex parte Weinstein , 421 S.W.3d 656, 665 (Tex. Crim. App. 2014). The standard of materiality for a prosecutor's knowing use of perjured testimony is the well-known harmless error standard of Chapman v. California , 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), i.e., that "the evidence is material (and harmful) unless it can be determined beyond a reasonable doubt that the testimony made no contribution to the defendant's conviction or punishment." Napper , 322 S.W.3d at 241.
"[F]alse testimony is material only if there is a 'reasonable likelihood' that it affected the judgment of the jury." Weinstein , 421 S.W.3d at 665. "Thus, an applicant who proves, by a preponderance of the evidence, a due-process violation stemming from a use of material false testimony necessarily proves harm because a false statement is material only if there is a reasonable likelihood that the false testimony affected the judgment of the jury." Id. "The applicant must still prove his habeas-corpus claim by a preponderance of the evidence, but in doing so, he must prove that the false testimony was material and thus it was reasonably likely to influence the judgment of the jury." Id.
*723 A habeas applicant relying on a due process false testimony contention must show both materiality of the testimony and that the error in its use was not harmless if the defendant could have raised the claim in the trial court or on direct appeal. Ghahremani , 332 S.W.3d at 481-82. But if the applicant could not have raised the matter at trial or on appeal, in a habeas proceeding he must show materiality but need not show the error was not harmless. Id. at 482.
In the instant case, Applicant raised the issue of Godfrey's perjury on direct appeal. Specifically, he asked the court of appeals to abate the appeal and allow him to pursue an out-of-time motion for new trial based on the newly discovered evidence. The court of appeals overruled his motion to abate. Lalonde , 2016 WL 6426811 at *2-3, 2016 Tex. App. LEXIS 11763 at *7-8. Thus, Applicant's claim is to be measured under the normal constitutional harmless error standard, and he must show both materiality of the testimony and that the error in its use was not harmless.
B. Analysis
To resolve Applicant's habeas claim based on the use of false testimony, we first determine whether the testimony was false. Weinstein , 421 S.W.3d at 665. The parties agree that Godfrey provided false testimony. Godfrey testified that he had served as an instructor for the State of Texas, various federal law enforcement agencies, EPIC, and had trained police officers in several states, but EPIC officials were unable to find any documentation or evidence indicating that Godfrey had ever been an EPIC instructor.
Thus, it is undisputed that Godfrey provided false testimony. It is also undisputed that he was a member of the prosecution team. Therefore, the only question is whether such testimony was material. Id.
Here, Godfrey's false testimony is not material, on its face, because his credentials have no direct bearing on whether Applicant gave consent to search. The part of Godfrey's testimony that does have a direct bearing on the matter of consent, instead of being false, appears to be true. Regarding Applicant's consent to search his residence, other officers testified in a similar manner as did Godfrey. For example, Deputy Reyna testified at the suppression hearing that Applicant specifically gave consent "[t]o search the house, to search the barn, the upstairs room." Rep. R. vol. 2, 19. When asked if Applicant said "grant consent to search," Reyna answered, "Yes." Id. at 20. At trial, when asked whether Applicant gave consent to search, Reyna also stated, "Yes, ma'am." Rep. R. vol. 4, 31. When asked again whether Applicant gave consent and consented to search after being informed that he could so consent if he lived there, Reyna again responded, "Yes, ma'am" and "Yes." Id.
Captain (formerly Sergeant) Davidson testified at the suppression hearing that he overheard Applicant give consent to search his residence after Godfrey informed Applicant that, since he was residing at the residence, he had the right to give consent. Rep. R. vol. 2, 24-25. When asked if Applicant gave consent to search the residence, Davidson responded, "Yes, ma'am." Id. at 28. And at trial, Deputy Landeros's testimony also reflected that after it was explained to Applicant that he could consent to a search because he was the custody holder of the residence, Applicant consented to such a search and that thereafter Godfrey and other officers went upstairs to the residence. Rep. R. vol. 4, 50-51.
Thus, although Godfrey gave false testimony about his credentials, the part of his *724 testimony directly relevant to Applicant's consent to search appears to be truthful.
Arguably, Godfrey's false testimony about his credentials may have made him appear more worthy of belief in the eyes of the trial court at the suppression hearing or the jury at trial, and the trial court or the jury would have been more inclined to believe his truthful testimony about Applicant's consent. In this sense, the false testimony made some level of contribution to the result. However, this contribution is de minimis because Godfrey's testimony about Applicant's consent was similar to and cumulative of the evidence from the other officers. The veracity of those other officers is not challenged. There is no reason to believe that Godfrey's false testimony regarding his qualifications and training contributed to the trial court's decision to deny the motion to suppress or the jury's verdict.
We conclude that the false testimony was not material. Accordingly, there is no showing of a due process violation based upon the admission of such testimony, and Applicant's conviction should not be set aside based upon Godfrey's aggravated perjury.
III - BRADY CLAIM
Applicant also claims that the State violated Brady regarding Godfrey's aggravated perjury. He asserts that the State's failure to disclose the investigation of Godfrey violated his right to due process of law and necessitates the grant of habeas corpus relief.
A. Standard of review
In Brady v. Maryland , the United States Supreme Court "[held] that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady , 373 U.S. at 87, 83 S.Ct. 1194. Thus, Brady is violated when three requirements are satisfied: (1) the State suppressed evidence; (2) the suppressed evidence is favorable to the defendant; and (3) the suppressed evidence is material. Harm v. State , 183 S.W.3d 403, 406 (Tex. Crim. App. 2006). "Incorporated into the third prong, materiality, is a requirement that [the] defendant must be prejudiced by the state's failure to disclose the favorable evidence." Id.
"Favorable evidence is any evidence that, if disclosed and used effectively, may make a difference between conviction and acquittal and includes both exculpatory and impeachment evidence." Id. at 408 (citing Thomas v. State , 841 S.W.2d 399, 404 (Tex. Crim. App. 1992) and United States v. Bagley , 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) ). "Exculpatory evidence may justify, excuse, or clear the defendant from fault, while impeachment evidence is that which disputes or contradicts other evidence." Id. "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Bagley , 473 U.S. at 682, 105 S.Ct. 3375 ; see also Ex parte Adams , 768 S.W.2d 281, 291 (Tex. Crim. App. 1989) (adopting Bagley standard of materiality). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." Bagley , 473 U.S. at 682, 105 S.Ct. 3375. "Materiality is determined by examining the alleged error in the context of the entire record and overall strength of the state's case." Harm , 183 S.W.3d at 409. Brady evidence includes evidence that can be used to impeach the State's witnesses, i.e., "nondisclosure of evidence affecting credibility *725 falls within this general rule." Giglio v. United States , 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).
In order to prevail in a post-conviction writ of habeas corpus, applicant bears the burden of proving, by a preponderance of the evidence, the facts that would entitle him to relief. Ex parte Richardson , 70 S.W.3d 865, 870 (Tex. Crim. App. 2002). "Under Brady , the defendant bears the burden of showing that, in light of all the evidence, it is reasonably probable that the outcome of the trial would have been different had the prosecutor made a timely disclosure." Hampton v. State , 86 S.W.3d 603, 612 (Tex. Crim. App. 2002). The mere possibility that the undisclosed information might have helped the defense or affected the trial's outcome does not establish materiality. Id. The Brady Rule requiring the prosecution to disclose exculpatory and impeachment evidence to the defense that is material to either guilt or punishment encompasses evidence unknown to the prosecution but known to law-enforcement officials and others working on their behalf. Ex parte Reed , 271 S.W.3d 698, 726 (Tex. Crim. App. 2008).
B. Analysis
It is undisputed that the State failed to disclose the information about Godfrey's perjury until after the trial. Although the State indicates that it did not become aware of the perjury until after the trial, Godfrey was obviously aware of it when he testified at trial and at the suppression hearing. As noted above, due process prohibits prosecutors from presenting testimony that any member of the prosecution team, including both investigative and prosecutorial personnel, knows to be false, and prosecutors have a duty to reveal the perjured testimony of members of the prosecution team, whether or not the prosecutor has knowledge of such perjury. Because Godfrey was a member of the prosecution team, and the State did not disclose his perjury prior to the conclusion of the trial, the State suppressed such evidence.
As discussed above, favorable evidence, including exculpatory and impeaching evidence, if disclosed and used effectively, may make a difference between conviction and acquittal. Exculpatory evidence may justify, excuse, or clear the defendant from fault, and impeachment evidence disputes or contradicts other evidence. In this case, the evidence-at-issue does not justify, excuse, or clear Applicant from fault or guilt of the alleged drug-possession offense. However, that evidence does contradict Godfrey's testimony about his law enforcement background and could be useful in attacking his credibility in general. We conclude that the evidence was favorable to Applicant.
Having concluded that the evidence was favorable to Applicant, we must now determine whether the suppressed undisclosed evidence is material. Applicant argues that had trial counsel been made aware of Godfrey's perjury investigation he could have used such evidence to impeach Godfrey's testimony at the pretrial suppression hearing, and on that basis urged a different outcome on the issue of consent to search. He also asserts that he could have used the evidence to impeach Godfrey's trial testimony. Additionally, he asserts he could have used the evidence to assert greater leverage during the plea-bargaining process and thus brokered a more favorable plea offer. He insists that there is a reasonable likelihood that had the suppressed evidence been disclosed, the outcome of the proceeding would have been different, and, thus, the undisclosed evidence is material. Although we agree that Applicant could have used the evidence *726 of Godfrey's perjury in a number of ways, we disagree that the perjury evidence is material.
At the pre-trial suppression hearing, had Applicant known of Godfrey's perjury and had he used such evidence to impeach Godfrey's testimony, our confidence in the result that the motion to suppress would be denied is not undermined. Even if the trial court was informed that Godfrey lied about his background and qualifications in this case and in many others, his testimony about Applicant's consent to search was not, on its face, a lie because it was corroborated by the other officers. If Godfrey was wholly impeached and completely unbelievable in the mind of the trial court, our confidence that the trial court would have denied the motion to suppress is still unshaken, because the other officers testified that Applicant gave consent to search.
At trial, had Applicant been armed with and able to use Godfrey's perjury to impeach him in front of the jury, our confidence that the jury would have convicted Applicant is likewise not undermined. Even if the jury was convinced that Godfrey was not credible and it did not believe any of his testimony, the other officers testified that Applicant consented to the search.
As for Applicant's ability to use Godfrey's perjury as a bargaining chip in plea negotiations, we are not convinced that there is a reasonable probability that Applicant could have brokered a better deal. Godfrey was not the State's only witness. The State could have proven consent to search without Godfrey, the State's case could not have been hamstrung by Godfrey's perjury, and the State was therefore not put in any weaker bargaining position by virtue of Godfrey's perjury. Our confidence in the result of plea negotiations, that the parties failed to reach an agreement and proceeded to trial, is not undermined.
Accordingly, after reviewing all the evidence, the record does not reflect that the State's failure to disclose Godfrey's perjury to Applicant deprived him of a fair trial and resulted in a verdict unworthy of confidence. We conclude that the undisclosed Brady evidence was not material, and therefore, the State did not violate Brady regarding Godfrey's aggravated perjury.
IV - CONCLUSION
We deny Applicant's application for habeas corpus relief.
Keller, P.J., filed a concurring opinion in which Slaughter, J., joined. Keel, J., concurred.
Keller, P.J., filed a concurring opinion in which Slaughter, J., joined.
This Court has not been consistent about how to analyze false-evidence claims, and the Court's opinion in this case reflects those inconsistencies. I write separately to clarify how to categorize and treat various types of false-evidence claims.
False-evidence claims have three components: (1) the prosecution's use of false evidence, (2) the culpable mental state with respect to the falsity (knowing or unknowing), and (3) the materiality of the evidence.[1] Conducting a harm analysis is also sometimes required, depending on the nature of the false-evidence claim and when that claim is presented.[2]
As to component (1), evidence is "false" if, taken as a whole, it gives the factfinder *727 a false impression.[3] As to component (2), a prosecutor "knows" the evidence is false if he knew or should have recognized the misleading nature of the evidence.[4] Also, knowledge is imputed to the prosecution if falsity is known by a member of the prosecution team.[5]
As to component (3), the standard for determining materiality depends on whether the prosecution's use of false evidence is "knowing" or "unknowing."[6] If the prosecution's use of false evidence is "knowing," the evidence is material unless the court is convinced beyond a reasonable doubt that the false evidence did not contribute to the verdict (on conviction or punishment).[7] This standard of materiality is the same as the harm standard for constitutional error on direct appeal.[8]
When the use of false evidence is "knowing," this beyond-a-reasonable-doubt standard of materiality applies on both direct appeal and on habeas, but the standard of harm to apply on habeas corpus depends upon whether the false evidence claim could have been raised on direct appeal.[9] If the "knowing use" claim could not have been raised on direct appeal, then establishing materiality is sufficient to establish harm, just as it would be on direct appeal.[10] But if the "knowing use" claim could have been raised on direct appeal but was not, then the habeas applicant must meet the usual, higher, burden on habeas: to show harm, he must show by a preponderance of the evidence that the false evidence contributed to his conviction or punishment.[11]
This Court has not been clear about the materiality standard that applies to the "unknowing use" of false evidence, but logic and an assessment of the holdings in various opinions indicate that the materiality standard is the same as the harm standard used on habeas for late "knowing use" claims: for the false evidence to be material, the defendant must show by a *728 preponderance of the evidence that it contributed to his conviction or punishment. We have held that this preponderance standard applies to a habeas claim of "unknowing use" even if the habeas applicant could not have raised the claim on direct appeal.[12] Although we have suggested that this may be a harm standard,[13] it actually has to be a materiality standard, as I shall explain.
A necessary component of any Fourteenth Amendment due process claim is "state action."[14] Even the most outrageous behavior by a private citizen will not by itself establish "state action" for due-process purposes.[15] False evidence presented by a private citizen does not ordinarily implicate state action. Nevertheless, in Chabot , we held that a defendant could get habeas relief on a claim of unknowing false evidence if he proved by a preponderance of the evidence that the false evidence contributed to his conviction or punishment. The Court did not explain why the State was responsible for presenting false evidence unknowingly, but the theory seems to have been that if a trial is more likely than not corrupted by false evidence, due process just requires that we grant relief. The unknowing use of false evidence could be said to implicate state action through the actual subversion of the court proceedings if it is more likely than not that the evidence affected the outcome of the proceedings.[16]
But if false evidence is insignificant, we would not find a due process violation and then perform a harm analysis and find it harmless; we would say that there was no due process violation at all. And we have said as much. In Ex parte De La Cruz , we said, "[T]his Court has recognized that the use of material false evidence to procure a conviction violates a defendant's due-process rights under the Fifth and Fourteenth amendments to the United States Constitution."[17] There is no due process violation at all if evidence is not material.
Having said all of that, it appears that Applicant is raising a "knowing use" claim and that he may not have had the opportunity to raise this claim on appeal (if it was not discovered in time to develop in a motion for new trial). Assuming those facts, I agree with the Court that the record shows beyond a reasonable doubt that the evidence did not affect the outcome of Applicant's proceedings.

See infra .

See infra .

Ex parte Chavez , 371 S.W.3d 200, 208 (Tex. Crim. App. 2012) (citing Alcorta v. Texas , 355 U.S. 28, 31, 78 S.Ct. 103, 2 L.Ed.2d 9 (1957) ).

Ex parte Ghahremani , 332 S.W.3d 470, 477 (Tex. Crim. App. 2011).

Ex parte Napper , 322 S.W.3d 202, 243 (Tex. Crim. App. 2010).

Id. at 241-42. See also Ghahremani , 332 S.W.3d at 478, 482.

Ghahremani, supra at 478.

Id.

Id. at 481-83. See also Napper , 322 S.W.3d at 242. By raised on direct appeal, we mean, that the claim was or could have been raised at trial or in a motion for new trial, which would make it raisable on direct appeal. See Ghahremani , 332 S.W.3d at 482 (discussing the failure of a defendant in a prior case to "raise this matter at trial, in a motion for new trial, or on direct appeal").

Ghahremani , supra at 482-83.

Id. at 481. While this is still the standard, we have also recently indicated that, in general, claims that could have been raised on appeal cannot be raised at all on habeas. Ex parte Jimenez , 364 S.W.3d 866, 880 (Tex. Crim. App. 2012) ("[W]e recently noted our trend to draw stricter boundaries regarding what claims may be advanced on habeas petitions because the Great Writ should not be used to litigate matters 'which should have been raised on appeal or at trial.") (ellipses, internal quotation marks, and bracketing omitted). I have suggested that the knowing use of false testimony is a "rare exception" to that rule because a defendant's negligence in raising such a claim should not be a complete bar when the State has knowingly subverted the system. Ex parte Chavez , 371 S.W.3d 200, 215 (Tex. Crim. App. 2012) (Keller, P.J., dissenting). Instead, the habeas applicant should be allowed to raise a late "knowing use" claim but be required to meet the more onerous habeas harm standard: preponderance of the evidence. Id.

Napper , 322 S.W.3d at 242 (discussing Ex parte Chabot , 300 S.W.3d 768 (Tex. Crim. App. 2009) ).

See ids="7299866" index="67" url="https://cite.case.law/sw3d/300/768/#p770">id.

United States v. Morrison , 529 U.S. 598, 621, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000).

Colorado v. Connelly , 479 U.S. 157, 165, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

See Sanders v. Sullivan , 863 F.2d 218, 224 (2d Cir. 1988) ("It is simply intolerable in our view that under no circumstance will due process be violated if a state allows an innocent person to remain incarcerated on the basis of lies. A due process violation must of course have a state action component. We believe that Justice Douglas accurately articulated the appropriate definition that accords with the dictates of due process: a state's failure to act to cure a conviction founded on a credible recantation by an important and principal witness, exhibits sufficient state action to constitute a due process violation.").

466 S.W.3d 855, 866 (Tex. Crim. App. 2015).